UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
                                    )
HASSON J. RASHID,                   )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )    Civil Action No. 18-cv-11423-DJC
                                    )
                                    )
ANDREW M. SAUL, COMMISSIONER OF     )
SOCIAL SECURITY ADMINISTRATION,     )
                                    )
        Defendant.                  )
                                    )
_____ )

## MEMORANDUM AND ORDER

CASPER, J.                                                        March 17, 2020

## I.   Introduction

Plaintiff Hasson J. Rashid ("Rashid") filed a claim for disability insurance benefits ("SSDI") with the Social Security Administration ("SSA"). Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Rashid brings this action for judicial review of the final decision of Defendant Commissioner[1] of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ"), denying Rashid's claim for SSDI on August 19, 2016. Before the Court are Rashid's motion to reverse the ALJ's decision, D. 14, and the Commissioner's motion to affirm the ALJ's decision, D. 15. For the reasons discussed below, the Court DENIES Rashid's motion to reverse and ALLOWS the Commissioner's motion to affirm.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Court has substituted Andrew M. Saul for the previous Acting Commissioner, Nancy A. Berryhill, as Defendant in this suit.

1

## II. Relevant Factual and Procedural Background

Rashid ceased working in 2005. R. 185.[2] He filed a claim for SSDI with the SSA in August 2007, R. 358-359, asserting that he was unable to work as of January 1, 2005 due to being legally blind and having a heart condition. Rashid's applications were first denied by the SSA on November 27, 2007, R. 439, and then again on July 31, 2008. R. 360. At Rashid's request, an ALJ held a hearing on April 15, 2009 at which Rashid and a vocational expert testified. R. 106. On May 4, 2009, the ALJ found that Rashid had not demonstrated that he was disabled under the SSA. R. 371-77. There was no further administrative review of the ALJ's decision, making the ALJ's decision final and subject to judicial review. R. 378. On February 25, 2010, this Court (Woodlock, J.) allowed the unopposed motion for voluntary remand of the case to the Appeals Council for instruction to the ALJ, stating that the record, at the time "[did] not contain medical opinions regarding [Rashid's] residual functional capacity apart from a State Agency opinion, from November 2007, which [did] not evaluate [Rashid's] coronary artery disease." R. 381-82. Following remand by the Appeals Council, R. 388-90, the ALJ held a hearing on September 25, 2012 at which Rashid appeared *pro se* and testified. R. 124-26. On November 29, 2012, the ALJ issued a decision finding that Rashid was not disabled. R. 263-272.

Rashid appealed the ALJ's decision to Appeals Council. R. 413. On April 5, 2013, April 2013, the Appeals Council remanded the case to a different ALJ upon the conclusion that Rashid, who had appeared *pro se* at the ALJ hearing, "did not reflect [an] understanding of his rights at the hearing and the requirements of due process were not adequately addressed by the Administrative Law Judge." R. 411-14. Following a September 16, 2013 hearing at which Rashid appeared now

---

[2] Unless otherwise noted, all facts are drawn from the Administrative Record, D. 12, and cited as "R. _."

represented by an attorney, R. 177-198, the new ALJ issued a decision on September 20, 2013 that Rashid was not disabled. R. 243-52. On October 10, 2014, the Appeals Council again remanded the case ordering the ALJ to: (1) "obtain additional evidence concerning [Rashid's] impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence;" (2) "[g]ive further consideration to Rashid's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations;" (3) "[e]valuate and compare [Rashid's] past relevant work with [Rashid's] residual functional capacity to determine whether [Rashid] has the capacity to meet the physical and mental demands of the work as actually or generally performed" and (4) "[i]f [Rashid] is not found to be capable of performing past relevant work, complete the sequential evaluation process and determine whether [Rashid] can make an adjustment to other work existing in significant numbers in the national economy." R. 435-36. Following hearings on April 13, 2016, R. 77, and July 1, 2016, R. 63, during which Rashid proceeded *pro se*, the ALJ issued a decision on August 19, 2016, finding that Rashid was not disabled. R. 26-34. On September 12, 2017, the Appeals Council declined review, making the ALJ's decision the Commissioner's final decision subject to judicial review. R. 10.

Rashid now seeks judicial review. D. 1. Rashid has moved for an order reversing the Commissioner's decision. D. 14. The Commissioner has moved to affirm the decision of the ALJ. D. 15.

## III. Discussion

At base, Rashid argues that (1) the ALJ erred in disregarding his treating physicians' residual functional capacity ("RFC") assessments and other substantial evidence on the record; (2)
3

the ALJ did not clearly articulate the reasons for negating substantial admissible evidence relevant to the five-step sequential evaluation process and (3) that the ALJ failed to consider certain medical evidence supporting his claim. D. 1 at 6-8; D. 14 at 2-3.

### A. Legal Standards

#### 1. *Entitlement to Disability Benefits*

A claimant's entitlement to SSDI turns in part on whether a claimant has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 CFR §§ 404.1505-404.1511.

The Commissioner must follow a five-step sequential evaluation process to determine whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits should be granted. 20 C.F.R. § 416.920. The determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, if the applicant's RFC is such that the applicant can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given his or her RFC, education, work

experience and age, is unable to do any other work for which there are a significant number of jobs in the market, they are considered disabled and the application is granted. Id.

### 2. *Standard of Review*

This court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). The scope of the review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st. Cir 1999) (citing Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir 1996)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). As such, the Court must affirm the Commissioner's decision if it is supported by substantial evidence "even if the record arguably could justify a different conclusion." Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981).

## B. **Before the ALJ**

The record before the ALJ contained extensive evidence, including diagnoses and treatment, about Rashid's medical history, particularly regarding his heart condition.

### 1. *Medical History Presented to the ALJ*

#### a. *Cardiovascular Conditions*

Rashid's medical records demonstrate a history of angina. In October 2007, Stephanie Woolhandler, M.D., noted that, despite a history of unstable angina,[3] Rashid had recently been symptom-free. R. 840. In December 2007, chest and heart examinations at a gastrointestinal consultation demonstrated that Rashid's vitals were normal and specifically noting that "[h]eart shows regular rate and rhythm." R. 857.

In June 2008, imaging showed a borderline ejection fraction[4] of 50% and an echocardiogram demonstrated that there were no changes since March 2007. R. 864, 866. In October 2008, Rashid visited Dr. Woolhandler reporting chest pain and was prescribed anti-angina medication and a gradual increase in exercise. R. 865. Following this visit, an exercise stress test was conducted in May 2009 and showed no evidence of stress induced ischemia. R. 920, 971.

In May 2010, Rashid reported to Salim Jabbour, M.D. more chest discomfort and fatigue from his angina over the last year, but without shortness of breath, palpitations or dizziness. R. 966. Dr. Jabbour noted a normal examination and stated that Rashid's chest discomfort could be related to angina but did not require any aggressive testing. R. 966. An exercise stress test the following month showed no evidence of myocardial infarction, ischemia or wall motion abnormality. R. 972. In July 2010, Dr. Jabbour noted that Rashid "quite stable," prescribed Rashid a diet with a reduced fat intake and continued Rashid's medication. R. 969.

In January 2011, Rashid told Dr. Jabbour that he had not experienced chest discomfort, palpitations or dizziness for the past six months. R. 923. After this visit, Dr. Jabbour noted again

---

[3] Unstable angina is a condition in which the heart does not get enough blood flow and oxygen and can lead to a heart attack. Unstable angina: MedlinePlus Medical Encyclopedia, MedlinePlus (Mar. 17, 2020), https://medlineplus.gov/ency/article/000201.htm.

[4] An ejection fraction occurs when the pumping function of the heart is too low and can result in heart failure; a normal ejection fraction is around 55% to 65%. Heart failure - tests: MedlinePlus Medical Encyclopedia, MedlinePlus (Mar. 17, 2020), https://medlineplus.gov/ency/patientinstructions/000366.htm.

that Rashid "quite stable" and stated that there was no evidence of significant organic heart disease. R. 924. A month later, however, Rashid went to the emergency room reporting dizziness; a cardiovascular examination was conducted, and Rashid's results came back normal. R. 918-19. In June 2011, consultative examiner James Todd, M.D., reviewed Rashid's cardiac evaluations and reports that indicated minimal cardiac ischemia[5] of the anterior wall, normal ejection fraction and minor heart disease. R. 909. At that time, Rashid reported he had significant coronary disease and could only lift fifteen pounds with the right arm and five pounds with the left. R. 910. Dr. Todd noted that limitations about lifting were "unexplained on the . . . physical examination." Id. Rashid's heart examination and an electrocardiogram conducted that day were normal. R. 910-11. Dr. Todd stated that Rashid had "a body image that his heart is deteriorating when in fact Rashid has a mild coronary artery disease with New York Heart Classification of IIB." R. 911.

In April 2012, an exercise stress test showed average functional exercise capacity with no evidence of inducible ischemia. R. 1027. Later that month, Rashid told consultative examiner David Cahan, M.D. that he could walk one to two miles slowly, climb one to two flights of stairs slowly and do chores such as shopping, mopping and vacuuming and that he could carry up to two gallons of milk or water. R. 990-91. Rashid also stated that he spent his time doing errands, going for walks and taking care of his house. R. 991. Dr. Cahan observed a clear chest, unremarkable heart tones, intact nerves and grip strength, good range of motion in the joints and adequate ambulation. Id.

---

[5] Myocardial ischemia occurs when blood flow to your heart is reduced, preventing the heart muscle from receiving enough oxygen. Myocardial ischemia – Symptoms and causes – Mayo Clinic, Mayo Clinic (Mar. 17, 2020), https://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/symptoms-causes/syc-20375417.

7

In August 2012, Rashid went to Cambridge Hospital reporting chest pain for two days. R. 1080. Rashid's respiratory and cardiovascular examinations returned normal, but he was admitted overnight for observation. R. 1081-83. A week later, Rashid saw nurse practitioner Shona Gibson ("Gibson") and reported feeling better. R. 1112. Gibson noted that Rashid's chest pain was possibly due to fasting. Id.

Later that month, Rashid went to Jeremy Keller, M.D. complaining of constant tiredness. R. 1065. Dr. Keller conducted a heart examination and did not report anything abnormal. R. 1066. In November 2012, Rashid reported chest discomfort with extreme exertion to nurse practitioner Carol Connolly, who observed a normal cardiac examination. R. 1044-45. In December 2012, Rashid reported angina linked to fatigue, but no chest pains, to Dr. Keller, who observed another normal heart examination. R. 1055-58. An exercise stress test conducted that same month showed mild global systolic dysfunction, average exercise tolerance and no anginal symptoms or ischemic changes. R. 1049-50.

In March 2013, Rashid reported atypical chest discomfort without lightheadedness, dizziness or shortness of breath to Erin Rafferty, M.D. R. 1073-74. At the time, Rashid also reported that he could walk one to two miles at most before stopping due to leg pain. R. 1073. Dr. Rafferty observed a normal heart examination and recommended continuing current medications with follow up in one year or sooner if needed. R. 1074.

In June 2014, Rashid reported atypical chest pain at times, but chest and heart examinations returned normal and Dr. Jabbour continued Rashid's medications "since he is not feeling any different than he has been feeling" and recommended a followup appointment in three months. R. 1274. In May 2015, Rashid visited Deeptak Thatai, M.D. for an examination. R. 1281. Dr. Thatai

8

made no medication changes, did not think it was necessary to conduct another cardiac stress test and noted that Rashid's bradycardia appeared to have resolved. Id.

In November 2015, Rashid told Dr. Thatai that he walked all the time and could walk more than a mile and denied any exertion-induced chest pain. R. 1292. Rashid reported that he had last experienced chest pain two months prior and that it had resolved with a dose of nitroglycerin. Id. Dr. Thatai did not make any changes to his medication regimen but noted that he would do a stress echocardiogram and monitoring as a result of baseline EKG with a followup appointment in six weeks. Id.

### b. Ocular Conditions

Rashid has also been examined for low vision and technical blindness. R. 860. Rashid's medical reports contain notes that he is near-sighted and that he wears corrective lenses. R. 990 (noting that Rashid "has visual insufficiency of unclear etiology").

### 2. April 13, 2016 Hearing Before the ALJ

At the April 13, 2016 administrative hearing, Rashid and vocational expert James Sarno ("VE") were present. R. 77-95. When ALJ asked Rashid, appearing *pro se*, if he wanted a continuance so he could try to find legal representation, Rashid agreed to a continuance. R. 82. The ALJ took some testimony from Rashid about his work history before hearing from the VE. R. 84. Rashid confirmed that he worked as a maintenance worker between 1997 and 1999 and as a residential aide from 2002 to 2005. R. 85. He also worked as a warehouse material handler and an assistant caretaker. R. 88-89. The VE testified that Rashid's first job as a maintenance worker is categorized as "semi-skilled, SVP[6] 3, medium exertional level," that his employment as a

---

[6] The SVP rating is used as a guideline "for determining how long it would take a claimant to achieve average performance in a job." POMS § DI 25001.001(A)(77).

residential aide is a "skilled position" and "has an SVP of 6, medium exertion level," his position as an assistant caretaker is "unskilled, SVP of 2," and his warehouse work as "unskilled, SVP of 2, medium." R. 86, 90, 92. In response to the ALJ's hypothetical of a person who would be limited to "medium level of work, [lift] 25 pounds frequently, 50 pounds on occasion," "should not be exposed to any hazards. . . . [a]nd no concentrated extremes of heat and cold - - or heat or cold, humidity and no concentrated dusts, fumes, odors, gases, et cetera," the VE said that this person would not be able to do the caretaker job, but could do the warehouse worker job. R. 93-94.

### 3. July 1, 2016 Hearing Before the ALJ

The ALJ held a continued hearing on July 1, 2016. R. 65. Although Rashid was given additional time to get an attorney, he appeared *pro se* again and the hearing proceeding as the ALJ had indicated that it would. R. 65. Rashid testified that he was 70 years old, had received a master's degree and had last worked in 2005. R. 65. The ALJ reviewed the exhibits with Rashid which was supplemented by an updated medication list. R. 67. Rashid testified that before he came to Massachusetts in 1999, he had been diagnosed with unstable angina and treated for this condition. R. 67-68, 70. He then started getting sick in the early 2000s. R. 68. Although the timing of all of his treatment for this condition was not clear from Rashid's testimony, it appears that he was receiving medication and treatment for his angina in 2009 and 2010, but also long before he stopped working in 2005. R. 72-73. In addition to his testimony, Rashid submitted written statements into the record. R. 75-76.

### 4. August 19, 2016 Findings of the ALJ

Following the five-step process, at step one, the ALJ found that Rashid has not engaged in substantial gainful activity since January 1, 2005, the alleged onset date. R. 29. At step two, the ALJ found that Rashid has the severe impairment of coronary artery disease with unstable angina.

10

Id. In making this determination, the ALJ considered evidence in Dr. Woolhandler's September 25, 2007 report that Rashid was diagnosed with coronary artery disease and it limited his ability to perform heavy lifting and other strenuous tasks. Id. The ALJ also reviewed a November 5, 2008 report in which Dr. Woolhandler further noted that Rashid was prescribed a beta blocker, aspirin and a statin for his coronary artery disease and that he reported exercise induced chest pain occurring several times per week. Id.

At step three, the ALJ found that none of Rashid's impairments meet or medically equal the severity of one of the impairments or combination of impairments in the Listing. Id.

At step four, the ALJ assessed Rashid's RFC. At this step, the ALJ determined that Rashid had the RFC to perform medium work except that he should not be exposed to hazards, such as unprotected heights of dangerous equipment, concentrated extremes of heat, cold and humidity or concentrated exposure to environmental irritants such as dust, fumes, odors or gases. R. 29. With this RFC, at step five, the ALJ concluded that Rashid could perform his past relevant work as a warehouse worker. R. 33. Accordingly, the ALJ concluded that Rashid was not disabled under the SSA. R. 33.

### C. Rashid's Challenges to the ALJ's Findings

In essence, Rashid contends that the ALJ erred by (1) disregarding his treating physicians' RFC assessments and other substantial evidence on the record; (2) not clearly articulating the reasons for negating substantial admissible evidence relevant to the five-step sequential evaluation process and (3) that the ALJ failed to consider certain medical evidence supporting his claim. D. 1 ¶¶ 1-19; D. 14 at 2-3.

*1. The ALJ Did Not Disregard Rashid's Treating Physicians' Assessments or Any Substantial Evidence on the Record*

Pursuant to 20 C.F.R. § 404.1527(c)(2), the ALJ will give controlling weight to a claimant's treating physician when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." The ALJ may nevertheless give a treating physician's opinion lesser weight when it is not supported by substantial evidence. Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998) (citing Rivera v. Sec'y of Health & Human Servs., No. 92-1896, 1993 WL 40850, at *3 (1st Cir. Feb. 19, 1993)). The treating physician's opinion may not be supported by substantial evidence when it is "inconsistent with the other evidence in the record." Black v. Berryhill, No. 17-cv-11987-DJC, 2019 WL 135686, at *7 (D. Mass. Jan. 7, 2019) (quoting Reyes v. Berryhill, No. 16-cv-10466-DJC, 2017 WL 3186637, at *7 (D. Mass. Jul. 26, 2017)).

In deciding the proper weight to assign to a treating source opinion, the ALJ is required to consider the length of the treatment relationship, frequency of the examination, nature and extent of the treatment relationship, support of the opinion by medical signs and laboratory findings, consistency of the opinion with the record as a whole, specialization of the treating source and other factors that may support or contradict the medical opinion. 20 C.F.R. § 404.1527(c). The ALJ does not have to consider each fact expressly but must give "good reasons" for the weight afforded to a treating source's medical opinion. Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass. 2015) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)(2)). Additionally, the ALJ must ensure the determination is "sufficiently specific to make clear" to any subsequent reviewers the weight given to a treating source's medical opinion and the reasons for that weight. Reyes, 2017 WL 3186637, at *8 (quoting Alberts v. Astrue, No. 11-cv-11139-DJC, 2013 WL 1331110, at *8 (D. Mass. Mar. 29, 2013)).

Contrary to Rashid's contention, the ALJ did weigh his treating physicians' opinions and provided an explanation for the weight he accorded such evidence. R. 30-33. The ALJ accorded little weight to Dr. Woolhandler's opinion that Rashid had marked limitation of physical activity and, therefore, was incapable of even low stress jobs and could not perform even sedentary level work. R. 32. The ALJ determined that this opinion was inconsistent with the doctor's own treating records, which contain evidence of normal physical examinations, and the doctor's own assessment that Rashid's prognosis was good. Id.; see Lynch v. Berryhill, 368 F. Supp. 3d 292, 296-97 (D. Mass. 2019) (holding that a claimant's ability to perform some daily activities, conservative medical treatment and mostly normal mental status examinations provided substantial evidence for the ALJ's finding of not disabled). The ALJ also determined that Dr. Woolhandler's opinion was inconsistent with Rashid's test results, including an echocardiogram showing a normal ejection fraction and a normal stress test. R. 32. The ALJ afforded little weight to Dr. Cahan's opinion that Rashid could only perform light work as it appeared to be based upon Rashid's subjective allegations and was contradictory to Dr. Cahan's finding that Rashid had a normal physical examination. Id.

The ALJ accorded significant weight to Dr. Jabbour's opinion that Rashid was quite stable and that there was no evidence he had any significant heart disease based upon Dr. Jabbour's role as a treating physician and the corroboration of this opinion by Rashid's normal echocardiogram and exercise stress test showing only possible minimal ischemia. Id. The ALJ accorded Dr. Todd's opinion that Rashid had no limitations, other than avoiding heights, environmental irritants and temperature extremes, great weight because his opinion was supported by the objective clinical findings contained in Rashid's treating medical records, such as a nuclear cardiac perfusion with

gated SPECT imaging showing no evidence of myocardial infraction, ischemia or wall motion abnormality and a stress test showing no evidence of stress induced ischemia.  Id.

The ALJ also accorded the opinions of non-treating medical consultants significant weight because the opinions were consistent with the objective clinical findings contained in Rashid's treating medical records, such as normal stress tests, and with Rashid's extensive activities of daily living.  Id.  Furthermore, Dr. Goulding found that Rashid was capable of medium level work, which the ALJ determined was fully consistent with the medical evidence on the record.  Id.  As the ALJ weighed the physicians' opinions and provided an explanation for the weight he accorded, consistent with evidence in the medical record, his findings were based upon substantial evidence and does not constitute reversible error as Rashid contends.

> 2. *The ALJ Articulated His Reasoning Throughout the Five-Step Sequential Evaluation Process*

Rashid also appears to contend that the ALJ erred by not clearly articulating the reasons for negating substantial evidence found in his treating physicians' RFC assessments, relevant to the five-step sequential evaluation process.  D. 1 ¶ 4.  As discussed above, the ALJ discussed the evidence on the record in detail in making determinations at each step in the five-step sequential evaluation process.  D. 29-33.  Moreover, as noted, there is substantial evidence in the record to support his findings at each step.  That was also true with the ALJ's findings regarding Rashid's subjective statements regarding the intensity, persistence and limiting effects of his coronary artery disease and unstable angina which was inconsistent with his self-report of daily activities and the medical record.  R. 30.

### 3. The ALJ Did Not Fail to Consider Certain Medical Evidence Supporting Rashid's Claim

Rashid argues both that certain medical evidence is missing from the administrative record and also that the ALJ failed to consider such evidence in rendering his decision. D. 17 ¶ 7. As to the first argument, the burden is on the claimant to produce to the SSA all medical records in support of his claims. 20 C.F.R. § 404.1512(a)(1); see Jones v. Berryhill, 16-cv-11011-DJC, 2017 WL 3726018, at *24 (D. Mass. Aug. 29, 2017) (stating that "the claimant has a duty to exercise reasonable diligence in providing . . . relevant evidence to satisfy his burden of production at the first four steps of the process") (quoting Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); Fiske v. Astrue, 10-cv-40059-TSH, 2012 WL 1065480, at *26-27 (D. Mass. Mar. 27, 2012). The ALJ, however, "must develop the record with specific information and without evidentiary omissions." Mickevich v. Barnhart, 453 F. Supp. 2d 279, 287 (D. Mass. 2006) (quoting Mandziej v. Chater, 944 F. Supp. 121, 130 (D.N.H. 1996)). "Upon reviewing that record, the Court must determine 'whether the [alleged] incomplete record reveals evidentiary gaps which result in prejudice to the plaintiff'[and] [i]f the ALJ fails to fill those evidentiary gaps, and if they prejudice plaintiff's claim, remand is appropriate." Id. The Court addresses Rashid's various arguments in this regard.

*Records of Dr. Saravanan.* Rashid's contention that there is an evidentiary gap in the record because the record did not contain records from his primary care physician, Dr. Saravanan, does not require reversal or remand. Given the onset date of January 1, 2005, the record contained ample records of Rashid's treatment for his heart condition after that period and in and around 2011 when he apparently began seeing Dr. Saravanan. R. 916, 923. Moreover, Rashid does not adequately explain how any opinion from Dr. Saravanan would have changed the substantial evidence that supports the ALJ's decision.

*References to slow heartbeat and arrhythmia in the record do not warrant reversal.* Rashid alleges that there were repeated references to slow heartbeat and arrythmia included in the administrative record that were not considered by the ALJ. R. 17 at 9. First, the bare observation of a medical condition does not rise to level of a disability since "[a] mere diagnosis of a condition 'says nothing about the severity of a condition.'" Doshi v. Colvin, 95 F. Supp. 3d 138, 147-48 (D. Mass. 2015) (quoting White v. Astrue, No. 10-10021, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (quoting Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988))). Moreover, even such conditions may have noted, it is also true that there was substantial evidence that Rashid's condition was not a disabling one.[7] See, e.g., R. 910-11 (noting that Rashid's examination results were normal but noting that "patient has a body image that his heart is deteriorating when in fact he has mild coronary artery disease"); R. 991 (noting cardiac examination with unremarkable results). It remains that the ALJ's conclusion that Rashid had a severe impairment of coronary artery disease with unstable angina, but has the RFC to perform medium work, with certain qualifications, R. 28-29, is supported by substantial evidence in the record.

*Letter of support from nurse practitioner.* Rashid's contention appears to be that a letter of support from a nurse practitioner, Ms. Gibson, R. 1032, "would have demonstrated that there was no change[] in [his] heart condition[] first diagnose[d] by Dr. Woolhandler." D. 17 at 3, 9. The record does contain a statement, a "Cardiac Medical Source Statement" completed by Gibson, R. 1032-35, in which she concludes that Rashid is "incapable of even 'low stress' work." R. 1033. The ALJ did consider this input but accorded Gibson's opinion little weight as "[i]t seems based solely on the claimant's subjective allegations and is contradictory to all of his unremarkable test

---

[7] The same is true as to Rashid's contention that "silent ischemia," D. 21 at 1-2, requires a different outcome here.

results and normal physical examinations contained throughout the claimant's treating medical records." R. 32. Moreover, to the extent that Rashid seeks to have it counterbalance an opinion from Dr. Woolhandler or other physicians about his heart condition, it cannot do so. A medical source opinion may come from an acceptable medical source or other health care provider; however, nurse practitioners are not considered acceptable medical sources. SSR 06-03p, 2006 SSR LEXIS 5, 71 Fed. Reg. 45,593; see Hustead v. Astrue, No. 08-cv-30119-KPN, 2009 WL 1259132, at *4 (D. Mass. May 6, 2009) (noting "that the ALJ was actually precluded from giving controlling weight to [a nurse practitioner's] residual functional capacity assessment because she is not an 'acceptable medical source'"); 20 C.F.R. § 416.902(a)(7) (explaining that a licensed advanced practice registered nurse is not considered an acceptable medical source for claims filed before March 27, 2017).

*The record contained progress notes from Dr. Keller.* Rashid also complains that the ALJ did not cite information from Dr. Keller in his decision. D. 17 at 3. There was evidence from Dr. in the record regarding Rashid's anemia. R. 1054, 1066, 1068, 1180. The "failure to address a specific piece or pieces of evidence [do] not undermine the validity of [the ALJ's] conclusion . . . when that conclusion was supported by citations to substantial medical evidence in the record and the unaddressed evidence was either cumulative of the evidence discussed . . . or otherwise failed to support the claimant's position." Coggen v. Barnhart, 354 F. Supp. 2d 40, 55 (D. Mass. 2005) (quoting Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D.N.H. 2000)); see Tsouvalas v. Berryhill, 265 F. Supp. 3d 124, 130 (D. Mass. 2017) (quoting DaSilva-Santos v. Astrue, 596 F. Supp. 2d 181, 188 (D. Mass. 2009)) (alteration in original). Where Rashid has failed to explain how such evidence undermines the ALJ's well supported conclusion, there is no error in the ALJ's failure to cite Keller's records.

17

*Earlier medical records about unstable angina attacks.* Although there was extensive medical information regarding Rashid's heart condition in the record, he claims error that medical records from Dr. Piels and others from Cambridge Hospital, who, around the year 2001, were the first to treat him for unstable angina attacks, were not part of the record. D. 17 at 4. Putting aside the claimant's obligation to ensure that the record is complete, Rashid fails to explain that medical records that predate the alleged onset date of January 1, 2005, would warrant a different outcome here, particularly given the extensive treatment records and opinions regarding this condition since that time which the ALJ considered. R. 29-33.

*The administrative record contains Rashid's written statements.* Rashid claims that the ALJ declined his request to include his written statements into the record. D. 17 at 11. Although the ALJ declined to have Rashid read it at the April 2016 hearing, which he continued to allow Rashid to get counsel, the ALJ allowed him to submit that statement and another one at the July 2016 hearing and they appear in the record. R. 635-638; R. 75-76.

For all of the aforementioned reasons, the Court concludes that the ALJ applied the correct legal standards and his findings of fact were supported by substantial evidence.

## IV. Conclusion

Based on the foregoing, the Court ALLOWS the Commissioner's motion to affirm, D.15, and DENIES Rashid's motion to reverse, D.14.

**So Ordered.**

    /s/ Denise J. Casper
    United States District Judge